## BANQUE FRANCO-EGYPTIENNE *et al.* v. BROWN *et al.*

*(Circuit Court, S. D. New York.* March 19, 1888.)

1. RAILROAD COMPANIES—BONDS AND MORTGAGES—FRAUDULENT PROSPECTUS—RIGHTS OF BONDHOLDERS.

The complainants, acting as a syndicate, purchased part of an issue of railway mortgage bonds offered for sale to the public by a prospectus issued by the agents of the railway company. Trustees had been appointed by an agreement between the several constituent companies composing the railway company to receive and disburse the proceeds of the bonds for certain specified objects, among them the payment of the debts of the constituent companies. In a suit brought by complainants against the railway company, the trustees, and various defendants to whom the trustees had paid part of the proceeds of the bonds, the bill alleged that the prospectus contained various untrue and fraudulent representations; that the complainants relying thereon had been induced to purchase the bonds by fraud; that the trustees and the other defendants who had received part of the proceeds were aware when they received the money of the false and fraudulent character of the prospectus; and that the prospectus also contained a promise that the proceeds of the bonds should be used to complete the construction of the railway, and not for the extinction of liabilities of the constituent companies; but the proceeds were applied in part by the trustees, and were received by the other defendants in payment of such liabilities, with knowledge of this promise. The object of the suit was (1) to rescind the purchase for fraud, and charge the trustees and the recipients of the moneys from them as trustees *ex maleficio*; and (2) to enforce the promise of the prospectus as a promise to the purchasers of bonds in the nature of a trust, and compel the trustees and the recipients from them to account for the part appropriated contrary to the promise. *Held*, that complainants were merely creditors of the company, and as such, even were the issue presented by the bill, could not assail the validity of the agreement appointing the trustees, nor question the doings of the trustees as such.

2. SAME—PLEADING—MULTIFARIOUSNESS.

If the bill presented a case seeking relief because of the invalidity of the trust agreement, or the violation of the provisions of that agreement by the trustees, the conjunction of such a cause of action with the causes of action arising upon the prospectus would render the bill multifarious; and the joinder of causes of action so wholly disconnected would render the bill so obnoxious that the court *sua sponte* would refuse to tolerate it.

3. EQUITY—JURISDICTION—RESCISSION OF CONTRACTS—FRAUD.

Equity will not refuse jurisdiction of a suit to recover moneys obtained by fraud when the money in part has passed into the hands of several third parties with knowledge of the fraud, and the object of the suit is to reach what remains in the hands of the original wrong-doers, and follow the rest and reach it in the hands of the other defendants. In such a case the remedy is more adequate and complete in equity than at law.

4. SAME—MISREPRESENTATION IN PROSPECTUS.

Misrepresentation by prospectus, except as between promoters and shareholders, is to be tried by the ordinary criterion of misrepresentation. But a reasonable construction of the language of a prospectus may require that a future tense should be given to words in the past or present tense.

5. SAME.

A right of rescission because of misrepresentations in a prospectus must rest upon misrepresentations concerning material facts, and not of mere matters of opinion, and must relate to existing facts, and not to matters of future conduct or expectation. It cannot be founded upon the breach of pure promissory statements.

6. SAME.

Unless promissory statements are such as imply that a certain condition of things, or state of facts, exists at the time to form the basis of the promised

future state of things, they do not give birth to a right of rescission. Fraud cannot be predicated of promises not performed for the purpose of avoiding a contract.

7. SAME.

If a prospectus contains material false representations, those who authorize it to be issued cannot repudiate them as made without their authority, while retaining the fruits of the prospectus.

8. SAME.

A statement in a prospectus respecting the uses to which the moneys to be derived from the sale of bonds are to applied is to be construed as a representation of intention, or the expression of the expectation and purpose of the promoters, if the language falls short of a distinct and unequivocal promise.

9. SAME—FOLLOWING MONEYS INTO HANDS OF THIRD PERSONS.

When a prospectus contains a statement which may be construed as a promise by the promoters to the purchasers of bonds that the moneys derived from the sale of the bonds will be used for certain specified objects, and not otherwise, and the promoters upon receiving the moneys pay them out to creditors of the company, disregarding the promise in the prospectus, the bondholders, although they relied upon the promise in parting with their money, cannot reclaim it upon the theory of a trust, and follow it into the hands of those who received it lawfully from the promoters, although with notice of the promise. It is only when money is held in a fiduciary character, so that the equitable title is in the beneficial owner, that the latter can follow it into the hands of a third person.

Bill in Equity. The Banque Franco-Egyptienne *et al.*, complainants, filed a bill against John Crosby Brown, Jesse Seligman, W. W. Sherman, W. B. Duncan, and the executors of James Brown, deceased, and of Treanor W. Park, deceased.

*Evarts, Southmayd & Choate,* for complainants.

*Bangs, Stetson, Tracy & MacVeagh,* for John Crosby Brown and Jesse Seligman, defendants.

*Jennings & Russell,* for McCullough, administrator, etc.

*Lord, Day & Lord,* for executors of James Brown, deceased.

WALLACE, J. Although the pleadings and proofs in this case present a formidable record, the real controversy is a comparatively narrow one when limited, as it must be upon the bill of complaint and by the controlling facts, to its real proportions. The complainants sue on behalf of themselves and of all other persons similarly situated. They are the members of several banking firms, aliens and citizens of France, who, together with other persons not named in the bill, were acting in concert in March, 1873, as a syndicate to market $6,250,000 bonds of the New York, Boston & Montreal Railway Company, then offered to the public for subscription in London, and who became purchasers by subscription of two-thirds of the bonds. The bonds were part of an issue of $12,-250,000 first mortgage bonds created by the railway company pursuant to a consolidation agreement by which several constituent companies were united and merged together as a new corporation under the laws of the state of New York. That agreement, among other things, provided for the creation by the new company of first and second mortgage bonds,

to be used proportionately and upon trusts enumerated, in part for railway construction and equipment and in part to extinguish existing obligations of the constituent companies, which bonds were to be delivered to and negotiated by "disbursement trustees" to be thereafter nominated by the new corporation, and were to constitute a fund in their hands to be distributed and applied pursuant to the specified trusts. Before the disbursement trustees accepted the trusts, the provisions of the consolidation agreement were modified by the concurrence of the immediate parties to it, and a "disbursement trust agreement" was executed, by the terms of which the disbursement trustees were relieved of the duty of negotiating the bonds, the persons who were to act as such trustees were named, and the fund to arise from the negotiation of the bonds was·to be appropriated and applied upon somewhat different trusts from those originally enumerated. The persons named in this agreement as disbursement trustees formally accepted the trusts created by it. Shortly afterwards the bonds purchased by the complainants were offered to the public in London by Messrs. Bischoffsheim & Goldschmidt, who had undertaken with the consolidated company to market the bonds. The principal defendants in the suit are the trustees named in the disbursement trust agreement, to-wit., John Crosby Brown, Jesse Seligman, William Watts Sherman, to whose hands came the greater part of the proceeds of the bonds, together with William B. Duncan and the executors of James Brown, deceased, and of Treanor W. Park, deceased. The trustees assumed to distribute the proceeds of the bonds according to the terms of the disbursement trust agreement, and Duncan, Brown, and Park were beneficiaries under the terms of that agreement, and respectively received part of the proceeds.

The argument has taken a wide range, and it has been contended for the complainants—(1) That the trustees and the other original defendants were parties to a scheme of deceit and fraud by which unprofitable railroad properties were to be merged together and mortgaged, the mortgage securities marketed, and the proceeds captured by the promoters; that the complainants were induced by deceit and fraud to purchase the bonds, and thus to supply the proceeds which were to be appropriated, and were kept, as plunder by the promoters; and that they are entitled to resort to a court of equity, charge the defendants as trustees *ex maleficio*, and follow the proceeds. (2) That the complainants were induced to purchase the bonds, relying upon the truth of certain false and fraudulent representations contained in the prospectus issued in behalf of the consolidated corporation when the bonds were offered for sale upon the London market; that the defendants knew this when the proceeds came to their hands respectively; and, that, having received the proceeds under such circumstances, the defendants are trustees *ex maleficio* even though they were innocent and honest otherwise in their participation in the transactions complained of. And (3) that the proceeds of the bonds were a trust fund in the hands of the trustees, impressed, both by express contract and constructively, with the equitable rights of the complainants to have them applied for specified purposes; that the trustees have disre-

garded and subverted these equities by applying the proceeds to foreign objects; and consequently that they and the recipients from them with notice must account.

The theory of a contract trust rests on the propositions—(1) That the complainants were entitled to avail themselves of the trusts created by the consolidation agreement; that this agreement was the charter of the company, and could not be materially changed without legislative sanction; that the trustees and the recipients of the fund arising from the proceeds of the bonds were bound to know that any disposition of the fund contrary to the provisions of that agreement was unauthorized; that the disbursement trust agreement, so far as it permitted a different disposition, was consequently invalid; and that it was the duty of the trustees to return the proceeds to the complainants unless they were willing and able to conform to the directions of the consolidated agreement. (2) That the prospectus, upon the faith of which the complainants bought the bonds, contained an express promise that the proceeds should be applied by the trustees in a specified manner, to-wit, should be held and applied by them for completing the construction of railroad property, while the remaining first and second mortgage bonds should not in the mean time be offered for sale, but should be held by them for the extinction of all outstanding bonds and stock of the constituent companies; and that, if the trustees were not parties to this promise, so that it is not to be treated as a promise by them, nevertheless they knew of it when they received the proceeds,—knew that the railroad company had pledged itself accordingly, and were bound either to repudiate it and return the moneys or apply them conformably to the promise.

It will be found that if the bill of complaint asserts more than two distinct causes of action or grounds of recovery against the defendants, there are but two which the evidence justifies in any view that can reasonably be taken of it. The complainants allege in substance in their bill that they loaned to the railway company the amount of money advanced upon their subscription for the company's bonds; that they subscribed for the bonds upon the faith of a prospectus issued to induce the subscription; that the prospectus contained various representations concerning the character and value of the mortgaged property, and the condition and circumstances of the enterprise in which their money was to be used; that they knew nothing in respect to these matters but what they learned from the prospectus, except that various of the persons who were named in it as connected with the enterprise were regarded as men of wealth and high standing; that many of the material representations contained in the prospectus were false and fraudulent, put forth to stimulate a subscription on the part of persons like the complainants, ignorant of the natural features and surroundings of the said railway enterprise; that in consequence they were deluded and beguiled into subscribing for the bonds, and the disposal of the bonds to them under the circumstances involved a gross fraud and imposition upon them on the part of the railway company, its officers and agents, and on the part of the said trustees; and that the complainants and other takers of the bonds similarly situ-

ated are entitled to reclaim the amount which they paid for the same, with interest. The bill also sets forth facts constituting another cause of action, which in substance is that the moneys of the complainants, received by the trustees on account of the bonds, were received by them to be disbursed according to the terms of a promise in the nature of a trust contained in the prospectus; that this promise was to the effect that $6,000,000 of the first mortgage bonds not then offered for subscription would be reserved by the trustees for the extinction of the liabilities of the constituent companies forming the consolidated company, and the proceeds of the $6,250,000 then offered would be used and applied by the trustees solely for completing the construction and equipping the railways of the company; that the moneys were used and applied by the trustees in violation of this promise; that the trustees attempt to excuse themselves for such misuse and misapplication by a claim that they acted under the provisions of an instrument called the "disbursement trust agreement;" that the complainants did not know anything of that agreement, or of any of the documents relating to the organization or condition of the railway company, when they subscribed for the bonds, but relied solely upon the prospectus and the representations and assurances therein contained; that the issuing of the prospectus was in law the act of the trustees, and when they received the complainants' money the trustees knew its terms and conditions; that the pretended excuse of the trustees is untenable, because, if the said disbursement trust agreement contained provisions inconsistent with the terms of the prospectus, it was alterable, and was altered by the prospectus, and moreover did not conform to the consolidation agreement under which the railway company was formed; that however much the terms of the prospectus may have differed from those of the consolidation agreement or the disbursement trust agreement, yet the trustees had no right to apply the complainants' moneys otherwise than conformably to the promise of the prospectus. In order to charge the defendants other than the trustees, the bill avers that the trustees disposed of part of the complainants' moneys to Duncan, Park, and Brown; that these persons, together with the firm of Seligman & Co., were among the promoters of the scheme for organizing the consolidated company, and mortgaging its property, and selected the trustees in their interest; that they received the moneys pursuant to their original plan of getting rid of their worthless interests in the pre-existing railway companies, and with full knowledge of all the facts and circumstances connected with the negotiation of the bonds. The prayer for relief (after an offer in the prayer by the complainants to surrender the bonds held by them) is that it may be adjudged that the disposal of the bonds to the complainants was fraudulent on the part of the company, its officers and agents, and of the trustees; that the complainants be repaid the money paid for the bonds, with interest, less interest received upon the bonds; that the trustees account and pay the same to the complainants, less such sums as may be refunded by the other defendants; and that the other defendants, who have received portions of the proceeds of the bonds from the trustees, account and repay the same to the complainants. The bill

prays for discovery, and for other relief to which special reference is unnecessary.

Plainly, the averments of the bill present two principal grounds of complaint against the defendants as the basis of the relief sought: *First*, that the money of the complainants was obtained by deceit, of which the prospectus was the vehicle, whereby complainants are entitled to rescind their subscriptions and reclaim the money of the defendants who received it and participated in the deceit, or were cognizant of the deceit when the money came to their hands; *second*, that the prospectus contained a promise, in the nature of a trust to the effect stated, whereby the complainants are entitled to reclaim their money of the trustees who received it and applied it, disregarding the promise, and of the other defendants who received it with knowledge of the facts. There are allegations in the bill which may have been designed to charge that the trustees, as well as Duncan, Park, and Brown, were parties to a scheme of deceit and fraud, by which unprofitable railroad properties were to be merged together and mortgaged, the mortgage bonds marketed, and the proceeds captured by the promoters; and that the complainants were drawn into this scheme and induced to purchase the bonds, and thus supply the plunder which was to be and was appropriated by the promoters. Certainly, a considerable part of the argument for the complainants at the bar has proceeded upon the theory of such a cause of action, and that the complainants are entitled upon that theory to reclaim their money in a court of equity. But if any such charge was originally contemplated by the bill, the evidence to support it is not found in the record. Nothing in this controversy is better established by the proofs than that all the defendants, who were among the promoters of the consolidation scheme, were convinced that their enterprise offered excellent prospects of success as a practical and legitimate undertaking, and believed when the mortgage was created that the bonds subsequently bought by the complainants were a good speculative investment, and would ultimately prove a safe and profitable one for the purchasers.

A narrative of the transactions preceding the issuing of the prospectus and the sale of the bonds is necessary.

The consolidation scheme originated in 1871; and negotiations ensued in which Messrs. Park, Duncan, and others, represented the Harlem Extension Railroad Company, Gen. Schultz (as agent for James Brown) and George H. Brown represented the Dutchess & Columbia Railroad Company, and Messrs. McKinney and Hoyt represented the New York & Boston Railroad Company; and a provisional agreement for a consolidation was reached in the spring of 1872. The scheme contemplated the merger of these three railway companies with two other railway companies, viz., the Putnam & Dutchess Railroad Company and the Pine Plains & Albany Railroad Company, which latter companies were to be organized to construct and bring into the proposed consolidated line intervening lines of railway. The Harlem Extension Railroad Company had been created in 1870 by the consolidation of the Bennington & Rutland Railroad Company with the Lebanon Springs Railroad Company, and upon

the merger of those two companies assumed a mortgage debt of the constituent companies of $2,500,000. In April, 1870, the Harlem Extension Railroad Company had created a mortgage to secure its bonds to the amount of $4,000,000, $2,500,000 of which were set apart to retire by exchange the mortgage bonds of the two constituent companies. The defendants Park and Duncan were large creditors of this company. According to the answers of these defendants, Park was a holder of $900,-000 of the bonds of the Harlem Extension Railroad Company, and $300,-000 of the bonds of the Lebanon Springs Railroad Company, and Duncan held $75,000 of the bonds of the Harlem Extension Railroad Company, and $24,000 of the bonds of the Lebanon Springs Railroad Company; and they were the owners of certain rolling stock in use by this company. The railway property of the Harlem Extension Railroad Company had cost about $4,000,000. Its railroad was about 117 miles in length, and was in operation from Rutland, Vt., to Chatham Four Corners, and it was the lessee in perpetuity of the Bennington & Glastonberry Railway. Prior to the merger, as is alleged by the answers, the two constituent companies had regularly met their obligations, but after the merger the Harlem Extension Railroad Company lost business connections theretofore existing, and had not earned operating expenses during the year 1871.

The Dutchess & Columbia Railroad Company was organized in 1866, and at the time of the negotiations had cost, with its equipments, about $2,600,000. Its road extended from Fishkill Landing, on the Hudson river, to Millerton Station, on the Harlem Railway, near the Connecticut line, a distance of about 59 miles. Nearly $1,500,000 had been paid in on its capital stock. Its first mortgage bonds ($1,500,000) had been sold at from 80 to 85 per cent. of par. It had a second mortgage for $600,000, a third for $125,000, and a fourth for $275,000. At one time it had been leased by the Boston, Hartford & Erie Railroad Company for an annual rental of $200,000, but this company had defaulted in payment of rent, and, upon the termination of the lease, in March, 1870, the railroad was without equipment, and without means. James Brown was a large stockholder and creditor of this company, his interest approximating the sum of $1,000,000. The president of this company was his son, the defendant George H. Brown, and the defendant John Crosby Brown was the trustee of the several issues of mortgage bonds. George H. Brown held $52,000 of its stock, and $6,000 of its first mortgage bonds, and John Crosby Brown held $5,000 of the stock and $74,-000 of its first mortgage bonds. After the termination of the lease to the Boston, Hartford & Erie Railroad Company, the railroad was without equipment, and without means to meet the interest on its mortgage debt; and thereupon James Brown purchased rolling stock and leased it to the company, and made advances to assist the company in carrying on its operations. At the time of the negotiation it was not earning operating expenses.

The New York & Boston Railroad Company was organized in 1869 to build a line of railroad from the Harlem river, near New York city, to

Brewsters, in the county of Putnam, a distance of about 58 miles, and was in progress of construction at the time of the negotiations. Messrs. Hoyt & McKinney had been the principal promoters of this company. About $2,000,000 had been expended in construction. It had created first mortgage bonds for $2,000,000. Among those who had assisted the enterprise financially were the banking firm of Seligman & Co., of which the defendant Jesse Seligman was a member. Prior to 1871 this firm had advanced the company over $160,000, and they had continued to make advances subsequently. While the consolidation scheme was pending they advanced $200,000 on $400,000 of its mortgage bonds, and $100,000 on $150,000 of the bonds.

The two completed railways had experienced the usual vicissitudes of young enterprises, and at the time were unprofitable, but there is no reason to suppose that their owners regarded them as likely to be permanently so; the uncompleted one, the New York & Boston Railway, had been projected by intelligent and enterprising men, who believed in its ability to maintain itself when completed. It occurred to those interested in the three disconnected railways that by building the necessary link lines to unite them together, and merging all under one management, the three concerns could be utilized as members of an extensive system, and a trunk railway line be formed extending from Rutland, in the state of Vermont, to New York city, having connections at the *termini* and at intervening points upon the line with other railroads, then built and in operation, or projected; and that the new company would be able to command a much larger traffic locally than had inured to the disconnected roads, a traffic that would develop and increase with the increase of facilities and the growth of the communities along the route, and would also command a valuable independent traffic from its connections with other railroads. This was certainly not an unreasonable expectation in view of the results of many previous instances of railway consolidations, and in view of the physical and geographical conditions of the particular enterprise. They proposed to construct a railway which should be not only a north and south line, terminating at Rutland in the north, and on tide water at the Harlem river near New York city on the south, and be an avenue of traffic reaching into Northern Vermont and Lower Canada, but one which by its connections with railways running east and west would derive a considerable business from the commerce between the eastern and western states. As the scheme took life and form it grew in dimensions, and the horizon of the promoters became enlarged, so as to include alliances and combinations with other important railway corporations to strengthen and fructify the new railway. Negotiations were commenced with the Erie Railway Company and with the Central Vermont Railway Company looking to such an alliance. A charter for an underground railway company in New York city was secured; and the construction of various branch roads to serve as tributaries to the main line was included in the program of the projectors. During the latter part of 1871 and the early part of 1872 the scheme gradually assumed a practical and defined form, and a basis

of consolidation was reached satisfactory to the parties having a controlling interest in the three principal railway companies. In the spring of 1872 the preliminary steps for carrying out the scheme of consolidation were so far matured that the two corporations for building the link lines were organized, and the provisional agreement of consolidation referred to was formally prepared and approved by the board of directors, respectively, of the five constituent companies which were to consolidate, viz., the New York & Boston Railroad Company, the Putnam & Dutchess Railroad Company, the Dutchess & Columbia Railroad Company, the Pine Plains & Albany Railroad Company, and the Harlem Extension Railroad Company. This agreement provided for the exchange of the capital stock of the constituent companies for the capital stock of the new company, the payment of the mortgage indebtedness of the constituent companies by the exchange or proceeds of mortgage bonds to be created by the new company; the payment and discharge by the constituent companies of all their outstanding liabilities; and the delivery of their respective railways to the new company,—those of the Harlem Extension Company and the Dutchess & Columbia Company to be delivered in complete condition and good order, and those of the Pine Plains & Albany Company, the Putnam & Dutchess Company, and the New York & Boston Company to be delivered with their tracks fully laid, graded, and bridged, and fenced according to law. The agreement further provided for the erection by the new company of first mortgage bonds to the amount of $15,750,000, and second mortgage bonds to the amount of $5,000,000, which were to be appropriated to retire by purchase or exchange the bonded indebtedness of the divisional companies, and pay for the rolling stock and equipment of the new company, and for the application of the capital stock not exchanged, and of mortgage bonds not thus appropriated to the general uses of the company. The proofs do not show satisfactorily what was the basis of adjustment between the several constituent interests, but the provisional agreement provided that the mortgage trustees should set apart $4,000,000 first mortgage bonds and $1,000,000 second mortgage bonds to be used for the exchange or purchase of the bonded and other indebtedness of the Harlem Extension Railroad Company and its constituent companies, the Lebanon Springs Railroad Company and the Bennington & Rutland Railroad Company; $1,030,000 first mortgage bonds for the purchase or exchange of the bonded indebtedness of the Pine Plains & Albany Railroad Company; $2,500,000 first mortgage bonds for the exchange or purchase of the bonded indebtedness of the Dutchess & Columbia Railroad Company; $1,720,000 first mortgage bonds for the exchange or purchase of the Putnam & Dutchess Railroad Company; and $3,000,000 first mortgage bonds for the exchange or purchase of the bonded indebtedness of the New York & Boston Railroad Company. It would seem from the evidence that the understanding between the promoters and the holders of the underlying indebtedness of the constituent companies was that the latter were to be paid 55 cents in cash and 45 cents in the stock of the new company per dollar for their securities, and it was doubtless

expected by the projectors that a sufficient surplus arising from the sale of the first and second mortgage bonds would remain to construct the several branch roads which were intended to be built. Shortly after the provisional agreement was thus approved, Messrs. Lowrey and George H. Brown were sent abroad as the agents of the several companies, to enlist financial assistance for the enterprise. At that time James McHenry, of London, was potent in the affairs of the Erie Railway Company, and Messrs. Bischoffsheim & Goldschmidt, of London, were its recognized financiers; and overtures had been made by the promoters to McHenry, who was then in this country, to assist them to obtain a loan. When Messrs. Lowrey and Brown arrived in London, Bischoffsheim & Goldschmidt had already been advised of their mission by McHenry. While there, Messrs. Lowrey and Brown prepared a printed report, which exhibited in detail all the physical features and conditions of the proposed railway, and statistics and estimates of the expected sources of revenue. They circulated this report extensively among leading bankers and capitalists. They took this report, together with all the documents necessary to show the previous and present *status* of the constituent companies, and the provisions of the scheme of consolidation, to and left them with Mr. Sharp, the solicitor of Bischoffsheim & Goldschmidt, to whom they had been referred by Bischoffsheim & Goldschmidt. Before they fulfilled their errand, McHenry came to London and took part in placing the enterprise before Messrs. Bischoffsheim & Goldschmidt. It commended itself to the favor of both McHenry and Bischoffsheim & Goldschmidt as one likely to be advantageous to the Erie Railway Company. As a result of the negotiations thus instituted, a tentative arrangement was made between the promoters and Bischoffsheim & Goldschmidt to the effect that, after the latter should bring out a new loan for the Erie Railway Company, which they were then about to offer, they would undertake the financiering of the new company; but that the consolidation scheme, which, as then devised, contemplated a mortgage of about $45,000 per mile of railway, should be so modified that the first mortgage should represent $35,000 per mile, and also that a definite arrangement should be made between the promoters and the Erie Railway Company for an alliance of interests. All the documents, statistical and legal, bearing upon the character and merit of the enterprise, were left by the agents of the constituent companies in the custody of Bischoffsheim & Goldschmidt, or their solicitor, Mr. Sharp, during the pendency of the negotiations, and remained there until the present controversy first arose.

The reduction of the amount per mile of the proposed first mortgage necessitated a readjustment between the promoters of the basis upon which the constituent properties should be provided for, the indebtedness of the company be satisfied, and the proposed enterprise be carried through. While negotiations to this end were going on between the promoters and the various parties in interest, negotiations were also commenced with the officers of the Erie Railway Company touching an alliance and the co-operation of that company in obtaining the necessary fi-

nances for the scheme. About the 1st of September, 1872, a contract was executed between the Erie Railroad Company and the five constituent companies, which, after reciting the proposed consolidation, a connection contemplated between the consolidated road and the Erie Railway by an underground railway to be built in the city of New York, and the ability of the Erie company, "through its friends and agents, and through the money and influence of those interested in its securities," to assist in the negotiation of the first mortgage bonds proposed to be made by the consolidated corporation, contained the following covenant:

" That the said party of the first part [the Erie Company] agrees that it will aid and assist the said parties of the second part [the five companies] to negotiate the said first mortgage bonds to be issued by such proposed consolidated company to the extent above recited, upon condition that the proceeds of such bonds shall in the first place be used only for the purpose of completing said main line from High Bridge to Rutland, and to put the said line in complete working order, and for paying such claims as may now exist, and which it is necessary should be paid, in accordance with the terms of such proposed consolidation, as the same are expressed in the agreement already made relating thereto; and said parties of the second part agree that all proceeds of such consolidated bonds, when the same are realized, shall be so used and disposed of to the extent aforesaid."

The contract then defined the terms of the traffic arrangements which were thereafter to exist between the Erie Railway Company and the consolidated company, and closed with a covenant by the parties of the second part that the contract should be fully confirmed and duly executed by the consolidated company as soon as organized, and a covenant by both parties that the duration of the contract should be for the term of 50 years.

About this time it became necessary for the promoters to assist the New York & Boston Railroad Company to raise money so that it might consummate on its part the proposed scheme of consolidation. Application was made to Bischoffsheim & Goldschmidt in this behalf, and they consented to advance about $400,000 for that purpose. As a condition of that advance an agreement was entered into between the five constituent companies and Bischoffsheim & Goldschmidt, bearing date October 31, 1872, reciting the proposed consolidation of the five constituent companies, and their purpose to create and issue mortgage bonds at the rate of $35,000 per mile upon the consolidated main line, to be negotiated by Bischoffsheim & Goldschmidt, and providing that the companies should proceed without delay to complete the proposed consolidation, and create and issue the proposed bonds, and place the same in the hands of Bischoffsheim & Goldschmidt for sale upon commission, and that Bischoffsheim & Goldschmidt should bring out, introduce, and undertake the sale of the consolidated bonds, on terms therein specified as to commission and brokerage, and should have an option to purchase the bonds at 90 per cent., less commission and brokerage. Concurrently with the execution of this contract, a written agreement in the form of a letter to Bischoffsheim & Goldschmidt was signed by five of the promoters personally, which, among other things, contained a promise that

the proposed first mortgage should be at the rate of $35,000 per mile, instead of $45,000, as originally contemplated.

The promoters being now ready to proceed in perfecting the modified scheme of consolidation, such proceedings were taken that the Dutchess & Columbia Railroad Company, the Putnam & Dutchess Railroad Company, and the New York & Boston Railroad Company consolidated together by the name of the New York Boston & Northern Railroad Company; and the Harlem Extension Railroad Company and the Pine Plains & Albany Railroad Company consolidated together under the name of the Harlem Extension Railroad Company; and shortly afterwards, and on or about December 19, 1872, the two companies consolidated as the New York, Boston & Montreal Railway Company. The agreements for consolidation were ratified by the stockholders of the several constituent companies, as required by law. The consolidation agreement which thus created the new corporation was executed under authority derived from chapter 917 of the laws of New York of 1869. This statute allows directors of companies proposing to consolidate to enter into a joint agreement under the corporate seal of each company, prescribing the terms and conditions of the consolidation and the mode of carrying the same into effect; and requires the agreement, after the same is ratified by the stockholders of the respective companies, to be filed in the office of the secretary of state. The statute does not impose any restriction upon the contracting corporations in respect to the terms of the agreement to consolidate, except that the capital stock shall not exceed the sum of the capital stock of the constituent companies, and that no bonds or other evidences of debt shall be issued as a consideration for consolidation. The statute also preserves unimpaired the rights and means of all creditors of the constituent corporations, and provides that all the debts and liabilities of those corporations, except mortgages, shall attach to the new corporation, and be enforced against it. The consolidation agreement provided, among other things, that the railway company should execute and deliver to Jesse Seligman, William Watts Sherman, and John Crosby Brown, as trustees, a mortgage of all its property then existing or thereafter to be acquired (except certain equipments) to secure its bonds to the amount of $12,250,000, to be known as its consolidated first mortgage, and a second mortgage to the trustees to secure additional bonds to the amount of $12,750,000, to be known as its consolidated second mortgage; and that the said first and second mortgage bonds, when issued, should be delivered to three persons as "disbursement trustees" to be nominated and chosen by the railway company upon specified trusts. These trusts were contained in the seventh article of the agreement, and were (1) to arrange for the sale of the first mortgage bonds when issued, by negotiating in advance of the issue, and publishing a prospectus in respect to the proposed issue conformably to the rules of any stock exchange, and to sign the same for the company; (2) to receive payments on account of the purchase money of the first mortgage bonds; (3) to invest the proceeds upon interest during such times as they should not be required for the purposes of the trust, and apply the interest to the gen-

eral objects of the trust; (4) "to set apart the amounts of first and second mortgage bonds mentioned in the next three sections of the article for the purposes, and dispose of the same in the manner, thereinafter specifically directed;" and (5) to sell and dispose of designated amounts of first mortgage bonds, and apply the proceeds respectively to specified purposes.

The provisions of the fourth and fifth trust are more fully set forth as follows: The fourth trust provides for the extinction of the debts of the several companies forming directly or indirectly the consolidated company, and to that end declares that the disbursement trustees shall set apart, hold, and dispose of specified amounts of first and second mortgage bonds, and apply the proceeds to purchase the following debts of the original companies at not exceeding 45 per cent. in cash, and the balance of 55 per cent. in second mortgage bonds: (1) $1,729,000 first mortgage bonds and $1,838,000 second mortgage bonds to the payment or discharge of the Dutchess & Columbia mortgage debt, and the Dutchess & Columbia unsecured debt, and any surplus to the mortgage trustees; (2) $1,552,000 first mortgage bonds and $1,650,000 of second mortgage bonds to the payment or discharge of the New York & Boston mortgage debt, and any surplus to the treasurer of the consolidated company; (3) $2,903,000 of first mortgage bonds and $3,087,000 of second mortgage bonds to the payment and discharge of the Harlem Extension mortgage debt, and the Harlem Extension unsecured debt, and the balance to the vendors of the Lebanon Springs Railroad Company and the Harlem Extension Railroad Company. The fifth trust declares that the trustees shall sell and dispose of specified amounts of first mortgage bonds, and apply the proceeds as follows, viz.: (1) $1,500,000 to the purchase of rolling stock and equipment; (2) $230,000 for a payment due under the Bennington & Glastonberry Railroad Company lease; (3) $172,000 for a payment due under the Clove Branch Railroad Company lease; (4) $897,000 to complete the Putnam & Dutchess Railroad; (5) $1,287,000 to complete the Pine Plains & Albany Railroad; (6) $805,-000 to complete the New York & Boston Railroad; (7) $1,000,000 to the payment of interest on the consolidated first mortgage bond; and (8) the balance to the treasurer of the consolidated Railway Company. George H. Brown was selected as president of the company, and Park and Duncan were selected as two of its directors. John Crosby Brown, Jesse Seligman, and W. Watts Sherman were selected as trustees under the mortgage. Other directors were chosen who represented the several constituent interests. It is to be noticed that by the agreement of consolidation disbursement trustees were to be selected by the consolidated company, and at some time previous to the issuing of its mortgage bonds were to negotiate and issue the bonds, and that in order that the bonds should be applied to the payment of the outstanding indebtedness of the constituent companies, as well as to construction and equipment, the entire issue was to be divided into specific amounts applicable to the several objects. Shortly after this agreement was executed, the new company found itself in need of funds, and applied through its president to

Bischoffsheim & Goldschmidt for a loan. February 6, 1873, Bischoffsheim & Goldschmidt made an advance to the new company of $270,687 upon its note with collateral, and the president of the company made an agreement with Bischoffsheim & Goldschmidt in the form of a letter authorizing them in substance to exchange the collaterals for the first mortgage bonds of the consolidated company when placed in their hands for sale. Before the bonds were issued, and before the disbursement trustees nominated by the company agreed to serve as such, the instrument known as the "disbursement trust agreement," bearing date February 11, 1873, was executed. The contracting parties to that agreement were the new corporation as party of the first part, and Seligman, Sherman, and John Crosby Brown, parties of the second part. The latter, who were the mortgage trustees, had likewise in the mean time been nominated as the disbursement trustees by the railway company. The instrument, after reciting the consolidation of the several railroad companies constituting the new corporation, the existence of certain specified indebtedness of the several companies, the execution by the consolidated company of its first and second mortgage bonds, the purpose of that company to have the proceeds and avails of these bonds applied to the extinguishment of the indebtedness of the several constituent companies, and the construction, completion, and equipment of the lines of railway of the consolidated company, then recites that, since the agreement of consolidation was made, negotiations for the sale of the first mortgage bonds "have resulted in an arrangement by which the same are to be sold, issued, and disposed of in accordance with the terms and conditions of a plan or prospectus for the sale thereof that has been or shall be put forth in the name of the said company at London, or as the same may be modified or altered," and that the avails are to be placed in the hands of the disbursement trustees, to be by them appropriated and applied solely for the purposes and uses thereinafter particularly designated. The agreement then provides that the company shall place in the hands of the disbursement trustees the proceeds of the entire issue of its first mortgage bonds, and $6,575,000 of its second mortgage bonds; directs the trustees to use the same in amounts and upon trusts specifically enumerated, and requires the application of the proceeds to be made *pro rata* upon the different trusts as avails of the bonds come to their hands. The agreement contained this clause: "Whatever proceeds and avails of said first mortgage bonds shall be received by the said trustees, they shall appropriate, distribute, and divide to and among the several applications to be made thereof, as hereinbefore provided, in the proportion that the bonds allotted thereto bear to the whole issue of such bonds."

The use directed constitutes the trusts of the agreement. The applications directed were as follows: (1) $1,729,000 first mortgage bonds and $1,838,000 second mortgage bonds to the payment of the mortgage and unsecured debt of the Dutchess & Columbia Railroad Company, at rates not exceeding 45 per cent. of the amount in cash, and the balance in second mortgage bonds at par; (2) $1,552,000 first mortgage bonds and $1,650,000 second mortgage bonds to the payment of the New York

& Boston Railroad Company mortgage debt, at not exceeding 45 per cent. of the amount in cash, and the balance in second mortgage bonds; (3) $2,903,000 first mortgage bonds and $3,000,000 second mortgage bonds to the payment of the Harlem Extension mortgage and unsecured debt, at 45 per cent. of the amount in cash, and the balance in second mortgage bonds; (4) $1,500,000 first mortgage bonds to the purchase of rolling stock and equipment for the consolidated railway, including the purchase of rolling stock sold to the company by James Brown and William Butler Duncan, $200,000 to each, respectively; (5) $230,000 first mortgage bonds for payment due the Bennington & Glastonberry Railroad Company upon a lease; (6) $172,000 first mortgage bonds for the payment due the Clove Branch Railroad Company upon a lease; (7) $897,000 to the completion of construction of the Putnam & Dutchess Railroad; (8) $1,287,000 to the payment for the construction of the New York & Boston Railroad; (9) $805,000 to complete the New York & Boston Railroad; (10) $1,000,000 to the payment of interest on the consolidated first mortgage bonds; and (11) the residue of the avails and proceeds of all the bonds to the treasurer of the consolidated company.

It will be seen that the disbursement trust agreement was intended to relieve the disbursement trustees of the duty of issuing and negotiating the sale of the mortgage bonds. The recital that an arrangement for the negotiation of the bonds had been made by the company after the consolidation agreement was executed was inaccurate, because the arrangement referred to was the agreement made between the five constituent companies and Bischoffsheim & Goldschmidt of the date of October 31, 1872, already mentioned. There was no occasion for the provision which had been incorporated in the consolidation agreement imposing this duty upon the disbursement trustees; and doubtless the insertion of a clause to that effect was an oversight, and resulted from copying the language of the provisional consolidation agreement in that respect, which had been prepared in the spring of 1872 for the approval of the constituent companies. The modification of the consolidation agreement introduced by the disbursement trust agreement had been considered and determined upon some little time previous to the execution of the latter instrument. In order to expedite the placing of the first mortgage bonds, the company, before the disbursement trust agreement was executed, and on February 6th, sent Mr. Sherman abroad with a power of attorney authorizing him to dispose of the bonds. This instrument gave him plenary discretion, and authorized him to substitute agents with like powers; but it was undoubtedly intended to permit him to make the formal agreement with Bischoffsheim & Goldschmidt, in the name of the new company, which had in effect been made in its behalf by the five constituent companies in October previously. Mr. Sherman carried with him duly authenticated copies of the agreement of consolidation of the first consolidated mortgage of the disbursement trust agreement then unsigned, and of other documents which it is not necessary to mention. February 12th the solicitors for the consolidated company sent by mail to McHenry in London duplicate copies of the same papers accompanied by the nec-

essary evidence of the execution of the disbursement trust agreement. Shortly after Mr. Sherman's arrival in London, he executed a power of attorney to McHenry, substituting the latter as an agent with full authority to contract for the consolidated company in the negotiation of the bonds. March 14th McHenry executed, on behalf of the company, an agreement with Bischoffsheim & Goldschmidt, by which the latter were empowered to negotiate the whole issue of first mortgage bonds,—$6.250,000 thereof within 14 days, and the remaining $6,000,000 "at such times and in such amounts as they should think fit, and whenever the main line of the company's railway from New York city to Rutland should be open to public traffic,"—at a price to produce not less than 90 per cent. of the par value, less commissions and charges. By the contract, the proceeds were to be paid by Bischoffsheim & Goldschmidt to the company by installments as received by them conformably to the terms of the prospectus to be issued. A prospectus announcing that Bischoffsheim & Goldschmidt were authorized to offer the bonds, and specifying the price and terms of payment, had been prepared, mainly by McHenry, in London, and had been circulated by Bischoffsheim & Goldschmidt among some of their friends, before the formal execution of this contract.

The facts thus summarized, with others of secondary importance, not adverted to, in the history of the consolidation scheme to the time the bonds were offered for sale, supply the *data* for inferences which are quite inconsistent with the existence of any such fraudulent conspiracy on the part of the promoters as has been asserted. It appears that by the scheme, as matured, the owners of the Dutchess & Columbia Railroad were to get only about $865,000 cash for property upon which about $2,600,000 had been actually expended for construction; the owners of the Harlem Extension Railroad were to get only about $1,106,000 for property upon which about $4,000,000 had been actually expended for construction; and the owners of the New York & Boston Railroad were to get only about $700,000 for property upon which about $2,000,000 had actually been expended for construction. These cash payments were very considerably less than the then value of the properties. These properties represented a considerable investment beyond the actual cost of construction by those who had contributed the means to the several companies to build and operate their roads. As an equivalent for these properties, and for the moneys invested in them by stockholders, bondholders, and creditors, the parties in interest,—mainly the promoters of the consolidation,—were to have, besides the cash payments mentioned, 55 per cent. of the outlay in second mortgage bonds; to which extent, of course, their reimbursement was contingent upon the ability of the company to provide for the interest and ultimately the principal of the first mortgage bonds. It is also manifest that the enterprise had commended itself to men of experience and prominence in railway undertakings, who were on the spot, and familiar, not only with the general features, but largely with the details of the scheme, and had no interest as promoters, but were consulting their own interests as the owners of adjacent rail-

ways; and these men had pledged themselves to assist in negotiating the first mortgage bonds among their own friends and business coadjutors. It further appears that the promoters had disseminated full information of the nature of their enterprise among leading financiers and capitalists in London early in the summer of 1872, and had endeavored to enlist the co-operation of bankers, who, through their correspondents and branch houses in New York city, had full facilities for discovering a fraudulent exploitation; that the promoters had at that time especially solicited the co-operation of Bischoffsheim & Goldschmidt, whose intimate relations with McHenry and the Erie Railway Company gave them direct sources of authentic and complete information; and that, after doing this, the promoters left their enterprise, the subject of investigation and criticism, to sink or swim upon its merits, until the spring of 1873. It seems utterly improbable that Bischoffsheim & Goldschmidt, after having this long period in which to acquaint themselves, through their counsel and financial agents at New York, and through McHenry and their associates in the Erie Railway Company, with everything that was needed to be known about the merits of the enterprise, would have risked their financial reputation, and committed themselves to the responsibility of marketing the bonds at 90 per cent. of par without resorting to information wholly independent of that communicated by the promoters; and unless they were parties to the alleged conspiracy, it must be inferred that they were convinced, after a sufficient investigation, that the enterprise was an honest one, and one to which they could reputably lend the sanction of their name. It is not claimed that they were parties to the conspiracy, but, on the contrary, this is disclaimed by the counsel for the complainants.

The salient facts and considerations thus referred to are sufficient to refute the charge of such a conspiracy on the part of the defendants. But it is proper to refer to other evidence in their exculpation. The report of Mr. Barnes, an engineer, and an authority of undoubted qualifications, experience, and reputation upon railway projects, made in the spring of 1872, has been produced. This report was not procured to influence the public, but was procured by John Crosby Brown for his own information, and at his own expense, in order to satisfy himself that the enterprise was one with which he could properly connect his name. Mr. Barnes made a careful personal investigation of the existing conditions and the prospective merits of the undertaking. His report embodies in detail a full summary of them; and his opinion was that the enterprise was a judicious one, and that the proposed consolidated railway would be adequate security for a larger mortgage than the first mortgage, which was subsequently created. The complainants have compelled the production by the defendants of the private letters passing between various members of the Brown family, and the private letters passing between the various members of the Seligman family, during the period from the inception of the scheme to the time the bonds were sold in London and subsequently, and put them in evidence, to reveal the secret history of the transactions in suit. These letters demonstrate the confidence of John

Crosby Brown and Jesse Seligman that the first mortgage bonds were a good speculative investment, and that the consolidated property ought to earn more than enough to meet the interest upon them. The letters of George H. Brown indicate his conviction that the earnings of the property, in view of all the combinations made or to be made, would be such as to make the second mortgage bonds as good as the first. The opinion of Mr. Duncan is manifested by his letter to Mr. Bischoffsheim, written when he had no interest to pervert the truth. This frank, unpremeditated, confidential letter speaks trumpet-tongued in vindication of his good faith. No letters indicating the opinion of James Brown or of Mr. Park are in evidence. James Brown was a man of advanced age when the scheme originated, and his interests were represented by Gen. Schultz, who had no personal motive to engage in a fraud. Mr. Park died before his testimony was taken in the cause, and his motives and views can only be conjectured.

It has seemed necessary to consider the charge of conspiracy made against the defendants, irrespective of the question whether the bill of complaint contains any such charge, because thousands of pages of the printed record are occupied by evidence of no pertinency to the controversy, except as bearing upon such a charge. If the charge is unfounded, the defendants are entitled to the benefit of a vindication. The conclusion reached is not only that the charge is unfounded, but also that it is without a shadow of justification. The promoters did not assume to be philanthropists, but they were not tricksters. They were well-known men of business, who concerted the consolidation scheme in order to make money for themselves. They were anxious to convert their investments in railways that were not productive at the time into investments that would be productive in the future; they convinced themselves that their enterprise had the elements of legitimate success; they were willing to stake a very considerable part of their investments upon the chances of its success; they expected to have to treat with men of experience, sagacity, and acuteness when they should apply for the necessary pecuniary means to float their enterprise and put it on its feet; and, finally, they sought for the means required of men who not only had as good an opportunity to judge of the merits as they themselves, but whose judgment was probably better, because more disinterested than their own. It would be strange if among the many actors in promoting the consolidation, some of whom are not defendants in this suit, there were not those who were unscrupulous, and cared little about the outcome so long as it was profitable to themselves. It would be strange if among the concomitants and incidents of such a scheme there were not things done, and other things left undone, which savor of recklessness, and bring reproach upon their authors, and measurably upon all associated with them. These things, however, fall far short of intentional fraud, and are common, if not inevitable, in the history of large projects of a speculative character like this one, in which the diversity of motives and interests is as various as are the temperaments and characters of those who participate.

Before considering the case with respect to the prospectus, and the

rights and liabilities of the parties growing out of the publication of that document, it is desirable to eliminate matters which have been argued at much length at the bar as authorizing a decree for the complainants, but which have no legitimate place in the real controversy between the parties. The substantive averments of the bill, so far as it proceeds upon trust, are, in effect, that the trustees are responsible to the complainants, because they undertook a trust relationship and responsibility to the complainants by the conditions of the prospectus, and cannot justify themselves as against the complainants under any of the documents relating to the organization of the railway company, or under the disbursement trust agreement, because they were required to conform themselves to the trust of the prospectus or return the complainants their money. The bill does not attempt to place the relief sought by the complainants upon their right to enforce the provisions of the consolidation agreement, or to assail the trusts of the disbursement trust agreement as contravening the provisions of the consolidation agreement. If such a case had been presented by the bill in conjunction with the causes of action founded upon the prospectus, the attempt to join a cause of action to enforce an express trust arising upon an instrument executed before the prospectus was published, and wholly inconsistent with the alleged trust contained in the prospectus, would have rendered the bill multifarious; and the joinder of such a controversy with one founded upon a fraud, or a series of frauds, whereby the complainants became entitled to reclaim moneys which they were induced to loan the company, would render the bill so obnoxious to the recognized rules of pleading that a court of equity, *sua sponte*, would refuse to tolerate it. A suit to enforce the provisions of the consolidation agreement upon the theory that trusts were created by that instrument in which the mortgage creditors of the company are beneficiaries would require the presence of all the persons and corporations to whom distribution of the proceeds of the bonds was to be made, and they are not defendants in the present bill; and would require different evidence, and the decree would proceed on widely different principles from one for the recovery of the money of the complainants that came to the hands of the trustees impressed with a different trust, or which they acquired *ex delicto*. In such a suit, the vast mass of evidence which appears in this record, and which was introduced to establish fraud, would have been utterly irrelevant; and the introduction of such an unnecessary and foreign issue into the bill would have been so inconvenient, oppressive, and vexatious as to impede and pervert the orderly administration of justice. Irrespective of any question of pleading, there is nothing in the provisions of the consolidation agreement upon which the complainants can found any right. That instrument did not create any trusts, but was an agreement between the parties who signed it for the future creation of trusts for their own benefit. The trustees never became parties to it, there never was any perfect institution of the trust contemplated by it, and before the trust fund which the parties to it proposed to create and distribute was created the contracting parties abrogated the agreement by substituting a new one. Until the persons se-

lected to carry out the trusts declared in the new agreement became parties to that agreement and accepted the trusts, the trustees had no official existence, and assumed no personal responsibility. The only express trusts which they have ever assumed are those which they accepted when they became parties to the disbursement trust agreement.

It remains to consider the case so far as it proceeds upon the theory that the defendants are responsible for the moneys claimed because they were obtained by the inducement of a prospectus which contained fraudulent misrepresentations of material facts, and also a promise amounting to an equitable obligation to apply the complainant's moneys in a way different from that observed. The officers of the railway company took a very subordinate part in formulating or issuing the prospectus. It was their understanding, and also that of all the promoters, that a prospectus was to be issued and published incident to the sale of the bonds. Such a document was necessary if the bonds were to be listed with the stock exchange. The consolidation agreement contemplated that the trustees would undertake the office of negotiating the bonds and issuing of the prospectus upon which the bonds were to be offered to the public, but before they consented to act as trustees the negotiation of the bonds had been committed to Bischoffsheim & Goldschmidt by those who controlled the affairs of the company; and by the terms of the disbursement trust agreement the trustees were to receive the proceeds for distribution among the objects and to the beneficiaries of the trust, and were relieved of the duty of negotiating the bonds. As has been stated, the agreement between Bischoffsheim & Goldschmidt of October 31, 1872, by which they became contractors for negotiating the bonds of the company, was an agreement between them and the constituent companies afterwards composing the consolidated company; and, by force of the statute authorizing the consolidation, this agreement became obligatory upon the consolidated company as soon as it came into being. This agreement was supplemented by the authority given to Bischoffsheim & Goldschmidt by the consolidated company upon the advance made by them February 6, 1873; and when Sherman went to London with the power of attorney, his mission, so far as it related to the negotiation of the bonds, was merely to conclude formally with Bischoffsheim & Goldschmidt a contract in behalf of the consolidated company embodying the terms of the previous agreement. Mr. McHenry was the mediary selected by the officers of the company to conclude the formal contract with Bischoffsheim & Goldschmidt; and pursuant to the previous understanding between the officers of the company and McHenry, Sherman substituted McHenry as agent for the company, with full powers to contract for the negotiation of the bonds, and thereupon McHenry executed the contract with Bischoffsheim & Goldschmidt of the date of March 14, 1873. Prior to the execution of this contract, McHenry and Bischoffsheim & Goldschmidt had been engaged in the preparation of the prospectus, and Bischoffsheim & Goldschmidt had applied to the complainants inviting them to assist in marketing the bonds. So far as appears, Sherman took no part in any of the acts of the promoters. He

had no interest in the enterprise, and knew nothing about its details. He went abroad upon a pleasure trip, and as soon as he returned home resigned as a trustee. The prospectus was issued and bears date as of the date of the contract.

It was supposed at this time by the officers of the railway company that McHenry had interested himself for the company because of the alliance which existed between it and the Erie Railroad Company, and because the Erie Railroad Company was anxious to promote the new enterprise and bring it to a completion; but in fact McHenry was acting with Bischoffsheim & Goldschmidt, and was a partner with them in the profits which they were to derive by commissions and otherwise by negotiating the bonds. When the agents for the promoters, who visited London in the summer of 1872 to solicit financial assistance, returned to this country, they left with Mr. Sharp, the solicitor of Bischoffsheim & Goldschmidt, who was also the solicitor of the Erie Railway Company in London, the printed report which they had prepared, as well as all the other instruments and papers relating to the several companies and the proposed scheme of the consolidation; and they also left with Bischoffsheim & Goldschmidt a statement embodying all the conditions and details of the enterprise, which statement had been delivered by them to Bischoffsheim & Goldschmidt as the basis for negotiations. McHenry resorted to these materials for the preparation of the prospectus, and on February 1, 1873, had prepared one, a proof copy of which was on that day mailed by him to the president of the consolidated company. This was received by Brown, the president, February 14th. With a view to its preparation, McHenry had cabled Brown, on January 27th, to send a statement of the intended appropriation of the first mortgage bonds "that we may state authoritatively that proceeds of said issue will complete works." Brown cabled him in reply, stating that $6,000,000 first mortgage bonds and $6,500,000 second mortgage were to be appropriated to redeem old mortgage indebtedness, $3,400,000 (first mortgage bonds) to complete new works, $1,500,000 for equipment, and $1,000,000 to meet future interest, "all in trust for these specific purposes," and also that with the $3,000,000 second mortgage bonds and $3,000,000 of unissued stock the company would have ample means to complete the whole line according to their programme; that 200 miles of lines were then in operation; that 56 more were ready for iron, and would be in operation by June; and that 50 more would be during the year. The proof prospectus forwarded by McHenry to Brown, February 1st, was prepared by McHenry in part from the information derived from this cable. It purported to offer for public subscription "$4,900,000, part of $12,-250,000 first mortgage bonds." It recited the formation of the railway company by the consolidation of the several constituent companies, and gave the names of the officers, directors, and mortgage trustees. It also contained the following statements:

"By the purchase and consolidation of the several lines mentioned, and by works in progress, these railways will form one main line connecting New York with Boston and Montreal. The entire line, including branches, will

be 350 miles in length, of which 200 miles are now in operation, 50 more will be completed and in working order by June next, and the whole will be completed during the present year. The route extends from the city of New York through the populous and fertile counties of Westchester, Putnam, Dutchess, Columbia, and Rensselaer, in the state of New York, the counties of Rutland, Anderson, Franklin, and Chittenden, in the state of Vermont, and the manufacturing county of Berkshire, in Massachusetts. Throughout the length of the line the local passenger and freight business promises to be very large, while in the vicinity of New York city it will only be limited to the capacity of the railway. The Erie Railway Company, considering that the control of this railway and its connections is of the first importance towards securing a direct entrance into the city of New York, with access to Boston, and the chief manufacturing towns of the New England states and to the British Provinces, have entered into working arrangements with the New York, Boston & Montreal Railway Company for a term of fifty years, and, without any closer connection at present, the lines will practically be worked as one administration. \* \* \* The holders of the first mortgage bonds of the several lines included in the consolidation have agreed to accept 45 per cent. first mortgage bonds of the present issue, and 55 per cent. of the second mortgage bonds. Messrs. Bischoffsheim & Goldschmidt are authorized to offer for public subscription $4,900,000 of the above bonds of the New York, Boston & Montreal Railway Company to complete the construction and equipment of the railways of the said company, the balance of $12,250,000 being reserved for the conversion of the divisional mortgage bonds issued by the several companies now constituting the New York, Boston & Montreal Railway."

Upon receiving this copy of the proposed prospectus, the president of the company had a consultation with Mr. Barlow, who was at that time the counsel of the Erie Railway Company and also the counsel at New York of Bischoffsheim & Goldschmidt, and as a result of the conference they both joined in a cable, sent February 14th, to McHenry, directing him to correct the prospectus so as to offer $6,250,000 for subscription, and also directing him to arrange for the sale of the remaining $6,000,000. The purpose of this dispatch is shown by a letter written the next day by Brown to McHenry, in which he uses this language:

"There is one point upon which I desire to touch that is very important to us. You do not fairly understand, I think, that we have contracts with the bondholders on the different roads to surrender their bonds and take in exchange, not first mortgage bonds, but 45 cents in cash and 55 per cent. in second mortgage bonds at par. Under the plan of prospectus sent us, if we rightly understand it, you propose to negotiate and sell on the London market only that portion of the bonds that is not to be used for conversion, and, if we judge rightly, leave us to settle with the old mortgage bondholders in first mortgage bonds, which, not being in accordance with our contract with them, would necessitate an advance on our part of the 45 per cent. cash necessary to carry out our agreements with them. This, as you are aware, we are not in position to do, and therefore we have already supposed that we should receive through Messrs. Bischoffsheim & Goldschmidt the proceeds of the whole $12,250,000; which proceeds, being placed in the hands of the disbursement trustees, would be held by them for the retiring under the contract of the old bonds. It will have a very damaging effect upon our credit here unless this contract, arranged with so much care and placed in the hands of such trustees as William Watts Sherman, John Crosby Brown, and Jesse Seligman, can be carried out by us. We may entirely misunderstand the terms of the prospectus, and by it may be intended that as soon as the $6,000,000 has been actually con-

verted, or, in other words, as soon as the trustees hold in their hands the old mortgages to cover the $6,000,000, or any part thereof, that then these bonds become available on the London stock exchange, and can be sold like the first issue through Messrs. Bischoffsheim & Goldschmidt under the contract."

A further explanation is found in a letter of the same date written by Barlow to McHenry as follows:

"The $6,000,000 (remainder first mortgage bonds) are reserved for exchange under consolidation agreement for existing prior mortgages on the whole line, but I assume that your prospectus is so worded that if the market will take the whole issue these surplus bonds, after cancellation of old bonds, can be sold. This is what the parties desire."

McHenry answered the cable of Brown and Barlow as follows:

"Disposal of your bonds absolutely certain, but I must be allowed to manage in my own time and fashion. Do not make engagements for expenditures until all is ready."

February 13th, McHenry mailed to the president of the company another copy of the proposed prospectus, and this was received by him February 26th. This prospectus purported to offer $6,250,000, part of $12,250,000 first mortgage bonds for public subscription, and contained this statement:

"The balance, $6,000,000, will be used for the extinction by conversion or payment of the divisional first mortgage bonds issued by the several companies now consolidated."

It also contained a statement of the estimated revenue of the railway from various specified sources. Otherwise it was a substantial duplicate of the first proof prospectus. In the mean time McHenry and Bischoffsheim & Goldschmidt were engaged in perfecting plans to bring out the loan. March 10th McHenry telegraphed to President Brown as follows:

"Prospectus will be issued Thursday. I engage the $6,000,000 firsts will be reserved until line opened in order to secure syndicate guarantee, but when first issue placed advances can be arranged on second half."

Brown immediately cabled to McHenry, (March 10, 1873:)

"Must not engage reserve without advances on the $6,000,000 at 87¼ currency net to us. Must have 45 cash on old securities to fulfill engagements and complete road. For this purpose need proceeds of whole issue."

McHenry cabled in reply, (March 11th:)

"I have placed $5,000,000 with syndicate to guarantee success. Can manage only $6,250,000, and shall manage $6,000,000 as circumstances permit."

What McHenry meant by this dispatch is more fully explained in his letter of the date of March 14th, to Brown. He said:

"In order to make an absolute success of this first issue and a consequent good market for further issue, I have arranged with the Paris syndicate and given them a large percentage for the guarantee of the subscription. I have arranged with Bischoffsheim & Goldschmidt to place at your disposal $1,000,000 monthly, say on the 6th of each month, until the loan is exhausted, particulars of which will be settled by cable. In the prospectus you will see that we have been compelled to insert a clause postponing the public subscription of the second issue until the main line is finished to Rutland. If it is neces-

sary for you to have money before the second issue, there is nothing in the prospectus to prevent a private subscription similar to that now practically made for the first issue."

This was the last copy of the proposed prospectus ever seen by any of the officers of the company or any of the defendants until some time after the sale of the bonds by Bischoffsheim & Goldschmidt.

The prospectus which was finally adopted, known as the "final prospectus," was prepared by McHenry shortly before March 14th, was issued on that day by Bischoffsheim & Goldschmidt, and a copy was sent by them to the Banque Franco-Egyptienne which was received by the latter at Paris March 15th. It seems to have been the thirteenth or fourteenth revision of the various prospectuses prepared by McHenry and Bischoffsheim & Goldschmidt between the last of January and March 14th. This document, after giving the names of the officers and directors of the company, offered the bonds for public subscription in the following language:

"Issue of $6,250,000, part of $12,250,000, first mortgage bonds (the remaining $6,000,000 being reserved for extinction of existing mortgages, will not be offered for subscription until the main line from New York city to Rutland is opened for public traffic) of the New York, Boston & Montreal Railway Company."

It contained this further statement:

"The proceeds of the present issue of $6,250,000 first mortgage bonds will be held by the trustees (Messrs. John Crosby Brown, W. Watts Sherman, and Jesse Seligman) for completing the construction and for the general purposes of the consolidated undertaking." * * * The documents connected with the company may be seen at the office of H. P. Sharp, Esq., 92 Gresham House, Old Broad Street."

It repeated in substance the statements recited in the two proposed prospectuses sent by McHenry to Brown concerning the general nature and conditions of the enterprise, and its relations with the Erie Railway Company; but it amplified in somewhat florid language the paragraphs which depicted the future prospects and plans of the company. It was largely devoted to representations intended to show the advantages which might be expected to inure to the Erie Railway Company by reason of the alliance between that company and the consolidated company, and bears evidence upon its face that those who prepared it and put it in circulation designed to influence the market for Erie securities abroad by advertising these advantages in glowing terms. There was also prepared by McHenry, and put into circulation in some instances by Bischoffsheim & Goldschmidt, a printed statement intended to supplement the advertisement of the enterprise contained in the prospectus. This also was largely devoted to showing the benefits expected to accrue to the Erie Railway Company from its relations with the consolidated railway. Most of the statements in this paper like those in the prospectus are promissory; and the only material ones not found in the prospectus are that "the corporation will own the lines from the Battery in New York to Rutland," and "the promoters propose to complete a first-class line with low grades and easy curves, in order to transport goods at a rate that shall defy competition." Copies of a map which had been prepared by some

of the promoters for exhibition in London in the summer of 1882, showing the route and plan of the proposed railway and its branches and connections, were also circulated with the prospectus by Bischoffsheim & Goldschmidt.   As there is no satisfactory evidence that any of the complainants or any of the officers of the railway company or any of the defendants ever saw the printed statement, and as the map is of trivial importance in any aspect of the case, no further reference to either of these papers is necessary.

At this time the complainants had organized themselves as a syndicate under the management of the Banque Franco-Egyptienne which had been formed to deal in loans brought out in London by Bischoffsheim & Goldschmidt for the Erie company and its affiliated concerns.   The firm had a house in London and in Paris.   Henry L. Bischoffsheim was the manager of the London house, and his father, Louis R. Bischoffsheim, was the head of the Paris house.   The firm in each city was composed of the same persons, except that Mr. Tallon, who was a member of the Paris firm, was not a member of the London firm.   Louis R. Bischoffsheim was the president of the Banque Franco-Egyptienne, and the Paris firm of Bischoffsheim & Goldschmidt were members of the syndicate. The London firm, as contractors for placing loans brought out by them in London, had been assisted by the Paris firm and the Banque Franco-Egyptienne in floating the loans.   In such operations it is customary to create and maintain a market for the securities until they are ultimately absorbed by the public at prices which are sufficiently remunerative to the contractors and their coadjutors.   The bank had formed a syndicate consisting of the same members when the London firm had recently marketed large issues of bonds for the Erie Railway Company and the Atlantic & Great Western Railway Company, and the syndicate had assisted in floating these loans, not as partners with the contractors, but as guarantors and subscribers for the loan upon commissions and options.   The Paris firm of Bischoffsheim & Goldschmidt and the other members of the syndicate were jointly interested in the profits of these transactions, and in the subsequent dealings of the syndicate in the bonds; and the relations between the syndicate and the London firm were such as to imply a mutual co-operation in manipulating the market for the profit of all concerned until the securities might be finally disposed of to the public.   Shortly prior to the making of the contract between the railway company and Bischoffsheim & Goldschmidt of London, by which the latter became contractors for bringing out the loan, Henry L. Bischoffsheim went to Paris to obtain the co-operation of the syndicate.   A letter of the date of March 4th, written to him after his return home by Mr. May, manager of the bank, shows the state of the negotiations at that time.   It is as follows:

"Our appetite is certainly still in existence, and your proposition is not of the nature to make it disappear, but before giving our decision in the name of the syndicate it is necessary for us to know all the conditions of the business.   It is probable that your letter of to-day will give us these details, and we will send you our reply as quickly as possible."

Although a considerable part of the private correspondence passing between some of the members of the syndicate and Bischoffsheim & Goldschmidt had been produced in evidence, the complainants have not produced the letter which was doubtless received by Mr. May or by some other member of the syndicate containing the details which Mr. May required and expected.  A paragraph in the same letter illustrates the character of the relations between the syndicate and Bischoffsheim & Goldschmidt, and is as follows:

"The very complete information which you give us on the subject of the New York, West Shore & Chicago Railroad Company is conclusive.  It is a matter to be left altogether aside."

In the mean time negotiations were taking place between Louis R. Bischoffsheim, representing the syndicate, and Henry L. Bischoffsheim of London by correspondence which has not been produced.  It would seem that by March 9th the information desired of "all the conditions of the business" had been obtained by Mr. May, or by Louis R. Bischoffsheim, and laid before the members of the syndicate.  On March 9th Mr. May wrote to Henry L. Bischoffsheim as follows:

"We had a committee meeting this morning to discuss Montreal (New York, Boston & Montreal Railway Company) business, and the following are the propositions which your father made to us:  (1) To guaranty the whole issue in consideration of one-half per cent. commission; (2) power for the participants of the syndicate of guaranty personally to subscribe after the close of the subscription and after knowledge of the result, to the whole extent of their share in the syndicate of guaranty, with power for you to reduce their subscription not exceeding one-third; (3) payment by you to the Banque Franco-Egyptienne of a commission of one-fourth per cent. on the subscription by the participants, that is on a minimum of two-thirds of the subscription.  This matter is accepted in principle, but as your father will inform you, we should prefer to have three-fourths per cent. for the guaranty of the commission instead of one-half.  As soon as you inform your father by telegraph that all the above conditions are accepted, the matter may be considered as settled, and you will please confirm the same to us by letter."

Before this letter was written, a copy of a proposed prospectus, the eighth revision, had been forwarded to the bank by Bischoffsheim & Goldschmidt, and been received.  March 10th the negotiations between the syndicate and the London firm were formally concluded on the part of the latter, and a letter embodying the contract was mailed on that day by the latter to the bank.  In substance, the arrangement was that the syndicate were to guaranty that the $6,250,000 bonds about to be offered to the public by Bischoffsheim & Goldschmidt should be "placed," and any amount not placed should be taken by the syndicate; and in consideration thereof the syndicate was to have a commission of one-half per cent. upon the amount, and an option of taking not less than two-thirds of the issue after the result of the public subscription should be known.  It was stipulated that Bischoffsheim & Goldschmidt should not change the terms of the prospectus as to the price of the bonds and the dates of payment upon subscriptions, and it was further understood

that the syndicate should be promptly notified of the result of the public subscription.

It appears that the course of business pursued by the contractors in the negotiation of such loans is to notify the public by advertisement, and by the circulation of the prospectus, when subscriptions may be made. These are generally made upon forms of application sent by the contractors, accompanying the prospectus, to bankers. The application list remains open for several days, and then the contractors proceed to make allotments to the applicants. If the applications are in excess of the loan offered, the affair is a success, and the contractors exercise their own pleasure in selecting the applicants and making allotments, or, as was contemplated in the present instance, decline to make allotments to the general public, and allot the loan, more or less of it, to themselves or their friends. The members of the syndicate were not formally notified that they had been included as participants in the guaranty, or in the subscription, until some time after the arrangement had, in the words of Mr. May, been "settled in principle;" indeed, some of them were not informed that anything of the kind was on foot until some days after the subscription had been actually made. The bank, after consulting with some of the members, assumed the responsibility of representing the rest, and on the 11th of March ratified the agreement embodied in the letter of Bischoffsheim & Goldschmidt of March 10th. Thereafter the bank addressed circulars to the members of the syndicate, announcing that they were respectively included as participants, and allotting them respectively specified interests in the commission and the option. The complainants acquired the bonds in suit by becoming participants in this option. The Paris firm of Bischoffsheim & Goldschmidt, as a participant, became a subscriber for nearly $1,500,000 of the bonds. As the prospectus underwent revision by McHenry and Bischoffsheim and Goldschmidt, copies of the revision were forwarded by them to the bank for inspection. As has been stated, a copy of the final prospectus reached the bank March 15th. March 18th Bischoffsheim & Goldschmidt telegraphed the bank as follows:

" Whole public subscription above $9,000,000 and below $10,000,000; telegraph instructions for to-morrow."

It is apparent that before this telegram was sent they had kept the bank advised of the extent of the public demand for the bonds and of the applications received. On the 17th of March they were notified that the syndicate had concluded to exercise its option of subscription; and by a letter of the date of March 17th they notified the bank as follows:

" In accordance with your instructions, we have subscribed on your account $4,166,000 first mortgage bonds of the New York, Boston & Montreal Railway, and we debit you with $41,660 in your account."

By the terms of the agreement with the syndicate Bischoffsheim & Goldschmidt were entitled, if the syndicate exercised its option for subscription, to reduce the subscription to one for two-thirds of $6,250,000. They did so, and allotted only the two-thirds, doubtless in order that the public might have the other third. The syndicate which, as origin-

ally formed, was to continue until August 15, 1873, unless sooner terminated, was dissolved early in April, 1873, and a new one was formed. This appears from notices given by the bank to the participants which are so instructive, as depicting what the syndicate really was and how its operations were managed, that a copy of one of them should be given. The circular notice dated April 14, 1873, is as follows:

" We have the honor to inform you that we have sold to a new syndicate, formed for the purchase of bonds of American railroads, the $4,166,000 New York, Boston & Montreal first mortgage bonds subscribed by our syndicate at the time of the issue. As the syndicate is by this event dissolved, the participants are released from the payments mentioned in our letter of the 12th of March, 1873, and not yet made. Your interest in the syndicate being £ ———, we place at your disposal at the office of Messrs. Bischoffsheim & Goldschmidt in London £ ———, forming your proportionate part of the sum above mentioned."

On the same day the bank sent a circular letter to the participants as follows:

" We have the honor to confirm to you that you are included for a participation of £ ———, in a syndicate formed with a capital of £3,200,000 to purchase and sell mortgage bonds of railways of the United States of America. This syndicate will exist until the 31st day of December, 1873. The syndicate has already secured the purchase of $633,000 Atlantic & Great Western first mortgage bonds at 80; $4,166,000 New York, Boston & Montreal first mortgage bonds at 82; $4,445,000 Erie Company convertible gold bonds at 82; total £1,702,669. You will therefore kindly pay to the credit of the Banque Franco-Egyptienne, at the office of Messrs. Bischoffsheim & Goldschmidt in London, 10 per cent. on your participation, viz., £ ———, for your proportional part in the call made by the syndicate."

The syndicate did not, however, dissolve December 31st. The following extracts from a circular letter sent by the bank to the participants, of the date of December 31st, explain why the syndicate was not dissolved.

" The duration of the syndicate of which you have vested the management in us being limited to the 31st of this month, we desire to explain to you the course it seems to us desirable to pursue at this moment in our joint interest. The crisis which prevails in America, and which took place so soon after the formation of our syndicate, has led to a certain depreciation in all railroad securities, and has restricted their sales. Although the securities held by the syndicate have been relatively speaking less injured by the crisis, we have not thought of selling them at prices which seemed to us below their real value. So far as concerns the Erie convertible gold bonds, and the small balance of Atlantic & Great Western first mortgage, we think that it is necessary to return to each the portion represented by his participation. The market for these two securities is sufficiently settled and their value is high enough to prevent this division of securities from leading to any inconvenience. So far as concerns the bonds of the New York, Boston & Montreal Railway, we are convinced that it is extremely important to remain united for some time still, as a joint course of action will alone allow us to carry on negotiations to the advantage of the participants. We will therefore send you, as soon as the accounts of the syndicate are settled, your share of Atlantic & Great Western and of Erie bonds as likewise the cash balance which may be due to you. You will thus remain a participant in the syndicate of $4,166,000 New York, Boston & Montreal bonds."

The relations which existed between the syndicate and Bischoffsheim & Goldschmidt in the transaction of marketing and dealing with the bonds are also characterized by what took place between them in January and February of 1874. In January the railway company was embarrassed, and the coupons for semi-annual interest on the bonds were to mature February 1st. Bischoffsheim & Goldschmidt wrote the bank, January 23d, as follows:

" After consideration, we think that it is against the interest of the syndicate to send *en bloc* to New York so large an amount of coupons * · * * to be cashed at the office of the New York, Boston & Montreal Company, * * * thus revealing to that company the small quantity of its bonds *which are in the hands of the public.*"

The syndicate accepted and acted upon the suggestion. About the same time the bank and the syndicate acquired information of certain "special advantages" which the London firm had received in the negotiation of the bonds for the railway company. To quote the testimony of Mr. May, "they acquired this knowledge at the same time that they learned that in the other enterprises as to which they had dealings with this firm it had taken special advantages, concerning which it had not informed them. It was a consequence of these discoveries, that the bank and syndicate, desiring to enforce their claim against the house of Bischoffsheim & Goldschmidt, of London, and the estate of Mr. Louis R. Bischoffsheim, entered into an arrangement in February, 1874, whereby the bank and the syndicate obtained satisfaction of their claims." This arrangement was an agreement, of the date of February 19, 1874, to which all the members of the syndicate were parties upon one side, and Bischoffsheim & Goldschmidt of London,. and the heirs of Louis R. Bischoffsheim of Paris, were parties upon the other side. By its terms the syndicate was continued until August 1, 1876, and Bischoffsheim & Goldschmidt agreed to pay the interest upon the bonds at their own risk during the continuance of the syndicate, and also to account to the syndicate for all losses upon the bonds at the selling price of 70 cents on the dollar. They also agreed to bear jointly with the heirs of Louis R. Bischoffsheim one-half of any further loss to the syndicate arising by a fall in the price of the bonds below 70 cents per dollar. Under this arrangement the syndicate has received over $1,000,000.

So far as the statements of the prospectus require consideration as misrepresentations which were intended to induce persons to buy the bonds, they may be divided into three classes—those relating to existing facts, those which are merely matters of opinion, and those of the character of promissory representations. If the complainants are entitled to resort to a court of equity to obtain a recission of their purchase of the bonds, and to reclaim the money they were induced to advance, because of misrepresentations in the prospectus, they must rely upon misrepresentations concerning material facts, and not as to mere matters of opinion, and which relate to existing facts, or be predicated of what was untrue at the time, and not of matters of future conduct or expectation. Misrepresentation by prospectus, except as between promoters and share-

holders, is to be tried by the ordinary criterion of misrepresentation. What was said by the lord chancellor, in *Hallows* v. *Fernie*, 3 Ch. App. 467, of the preliminary character of a prospectus is peculiarly apposite to the document in question:

"Everyone knows that it is intended to usher a company into existence. No one is surprised to find that a future tense must be given to words in the past or present tense. * * * This ought always to be borne in mind when a construction is to be put upon the language of a prospectus."

Almost all the statements in the prospectus, except those concerning the legal organization of the company, the amount of its bonds and stock, and the names of its officers and directors, are expressions of what is proposed to be done, and relate to the future plans of the promoters of the expected results of the enterprise. The only other statements which are not of this character, or are not mere expressions of opinion, are found in the paragraph which states that of the system "200 miles are now in operation, 56 miles more will be in working order by June, and the whole is intended to be completed during the present year," and the paragraph which, after reciting the advantages which the Erie Railroad Company will derive from the enterprise, refers to the "working arrangements" entered into between the two companies for the "term of fifty years." The only statement in these two paragraphs which was untrue was the one in reference to the number of miles of railway then in operation. In fact less than 190 miles were then in operation instead of 200. This misrepresentation doubtless originated in the cable message of Brown to McHenry of January 27th, and being accepted as true by McHenry, was incorporated by him into the prospectus. It was a statement made by Brown upon insufficient and erroneous data, put forth carelessly by the impulsive and over sanguine author without any deliberate purpose to deceive, in the belief that it was substantially true. The description of the proposed railway as one "extending from New York city to Rutland" and as one which would afford the Erie Railway, by junction at Fishkill," a direct entrance into the city of New York, was likely to convey a wrong conception of the location of the New York terminus of the railway, but was literally correct. The railway, as located at the time, terminated on tide water at the Harlem river, the northerly boundary of New York city, whence practical access to the business portion of the city was only by water communication. This fact had been explicitly pointed out by the promoters to Bischoffsheim & Goldschmidt in the communication addressed to them in the summer of 1872, and in the "report" circulated by the agents in London at that time, and distinctly appears in the mortgage itself. Inasmuch as the plans of the promoters included a connection of the railway with the heart of the city by the underground railway, for which they owned a charter, or by arrangements with some other rapid transit system, and the description is to be interpreted as speaking of the future, the language was not mendacious. The vice of the prospectus is found in the highly colored and exaggerated estimates of the probable sources of revenue of the railway. These were so artfully blended with arguments based upon the revenues

and profits of other railways that the presentation of the prospects of the enterprise was well calculated to delude and deceive the inexperienced or credulous investor. Although no legal responsibility can attach to the publication of these misleading matters of opinion, because no purchaser of bonds had a right to rely upon such opinions as an inducement to his purchase, they deserve severe reprobation, and the authors must be held morally accountable for a production which no honest and intelligent man should have sanctioned. The ardent confidence of promoters in the ultimate verification of their opinions is no excuse for putting forth reckless and fanciful estimates and assertions in such a circular to beguile the unwary. Primarily, the moral responsibility for this prospectus, which was mendacious in spirit if not in intent, rests on McHenry, Bischoffsheim & Goldschmidt, and such officers of the railway company, including George H. Brown, as saw the copies of the proposed prospectus sent to Brown by McHenry. No right of rescission can be founded upon the breach of the promissory statements of the prospectus. Promissory statements may be made in terms which imply that a certain condition of things exist at the time, and form the basis of the promised future state of things. When they are of this description, if they are intentionally false, they are fraudulent, and form the basis of a right of rescission; but otherwise fraud cannot be predicated of promises not performed for the purpose of avoiding a contract. Like untruthful expressions of expectation or opinion, even though when made they are made with intent to deceive, they are not fraudulent in legal definition, because they are not misrepresentations of existing facts. *Sawyer* v. *Prickett*, 19 Wall. 146; *Fenwick* v. *Grimes*, 5 Cranch. C. C. 439; *Jorden* v. *Money*, 5 H. L. Cas. 214; *Fisher* v. *Common Pleas*, 18 Wend. 608; *Ex parte Burrell*, 1 Ch. Div. 551; *Andrew* v. *Spurr*, 8 Allen, 412.

The promissory statements of the prospectus, except those which refer to the extent of line expected to be completed in the following June, and the time when the whole line and branches were to be completed, relate wholly to the application to be made of the proceeds of the bonds then offered to the public, and the purpose of the officers of the railway company to apply the bonds not then offered, together with other bonds and capital stock of the company, for the extinction of pre-existing indebtedness. The statements respecting the application of the proceeds of the bonds are to be ascribed in part to the defiant refusal of McHenry and Bischoffsheim & Goldschmidt to accede to the plans and wishes of the officers of the company, and in part to the understanding of the latter that the terms of the prospectus would not be such as to cripple the company in carrying out the engagements contained in the disbursement trust agreement. The officers of the company were so far committed to McHenry and Bischoffsheim & Goldschmidt in the negotiation of the bonds that they could not then recede without such a delay and rehabilitation of their plans for obtaining the necessary finances to carry out the scheme of consolidation as would propably have been fatal to it. McHenry and Bischoffsheim & Goldschmidt understood this perfectly well. They also knew that the company required the proceeds of the whole issue of first

mortgage bonds, or should have understood it, because the disbursement trust agreement had previously been placed in their possession and was then in their possession, or in that of Mr. Sharp, their solicitor. But it suited their purposes to offer only a part of the issue of first mortgage bonds at that time, doubtless because they believed that the bonds would bring a better price than if the whole issue were offered to the public then. With full knowledge of the situation, they insisted upon dictating the conduct of the affairs in a manner to suit themselves. The officers of the railway company did not see the final prospectus until March 27th, and at that time regarded the statement respecting the application of the proceeds of the bonds as of no practical importance in view of the representations of McHenry that there was nothing in the prospectus to prevent a private issue of the remaining $6,000,000, and that he had arranged with Bischoffsheim & Goldschmidt to advance $1,000,000 monthly until the loan was exhausted. But it is quite unnecessary at present to consider who was responsible for these statements of the prospectus, because as promissory representations merely they are of no consequence in passing upon this branch of the case. Inasmuch as the railway company received the proceeds of the bonds through subscriptions made by the complainants pursuant to the conditions of the prospectus, it must be regarded as the responsible author of the prospectus, and liable as a principal for the acts of its agents; and Bischoffsheim & Goldschmidt, who issued the prospectus, as well as McHenry, are to be deemed the agents of the company as between it and the public. In this view, if the prospectus contained any actionable false representations, the railway company cannot repudiate them while retaining the money; and even though they were not designedly false, if they were untrue the purchasers of the bonds became entitled to reclaim the moneys if they were induced to purchase in reliance upon such statements. The seller of property must be presumed to know whether the representations which he makes of it are false or true; and it is immaterial to a purchaser, who confides in them, whether the misrepresentations proceeded from fraud or mistake. *Smith* v. *Richards*, 13 Pet. 26. The misrepresentation of the length of railway lines in actual operation at the time the prospectus was issued might or might not be important and material to the purchasers of the bonds. A difference of a dozen miles more or less could hardly be considered a serious matter to the purchasers, if the traffic of the railway was as valuable and productive without them as with them; or if, as was the case here, the dozen miles and many more were speedily to be included in the security of the mortgage. If the complainants belonged to the class of investors who rely upon the information communicated by advertisements or a prospectus in becoming stockholders or creditors of a new company, the effect of this misrepresentation, and perhaps of other statements in the prospectus, would need to be considered, but it is impossible to believe that they trusted to the prospectus for the information which induced them to purchase the bonds. They were a body of speculators who were accustomed to embark with the bank, and co-operate through that corporation, with Bischoffsheim & Goldschmidt,

in floating the loans and trading in the securities of the Erie Railway Company and its allied concerns, and because the bonds in question were of this class and were brought out under such auspices, the bank assumed the responsibility of including them as members of the syndicate, and committing them, as participants in the present instance; and this was done when it was understood that Bischoffsheim & Goldschmidt were to prepare the prospectus as they pleased except as to the time and terms of the payments to be made. The inducement to the definitive subscription for the bonds was the information from Bischoffsheim & Goldschmidt that the public wanted double the amount offered. It is utterly improbable that men of the astuteness and experience of the complainants were induced to put millions of dollars of money into a speculation by the confidence reposed in the statements of any prospectus. None would have appreciated better than they the unreliability of such statements, or understood better the inaccuracies and exaggerations which generally characterize such advertisements. They were less interested in informing themselves about the real value of the bonds than ordinary investors, because they were not buying for a permanent investment but for a temporary one, and intended to sell them again when they were properly manipulated to advance the price. Buying the bonds for their speculative merits and not for their intrinsic value, the question with complainants was not what the bonds would be ultimately worth, but what they would probably sell for to the public, within a few weeks or months, when their price should be established by the dexterous methods of a combination of skilled operators. They were interested in the contents and form of the prospectus because it was important to them that the bonds be properly launched upon the market, and also because the document was designed in great part to advertise the benefits which would accrue to the Erie Railway Company from the new railway, with the obvious motive of enhancing the price of the securities already held by the syndicate. They doubtless scrutinized it for these reasons as it passed through the several revisions; they doubtless assumed that in a general way it correctly exhibited the enterprise; but that they relied upon it for the information which induced them to buy the bonds is too incredible for belief.

Many of the complainants have testified as witnesses in the cause. They state in substance that they relied upon each and all the representations of the prospectus in making subscription for the bonds. It is common experience, now that parties are competent witnesses, that such testimony is always forthcoming. It is not improbable that some of the witnesses honestly think that they did rely upon these representations, and are convinced that they purchased the bonds confiding in their truth. But each witness states positively that he had no information at the time that there were underlying mortgages on the property of the railway company, and if he had been aware of that fact he would not have become a subscriber. Yet this fact was distinctly stated in the final prospectus, and in the whole series of previous revisions, and appeared conspicuously in two places in the document. It was natural that the complainants

should rely upon the judgment of Bischoffsheim & Goldschmidt as safer than any they could form themselves without an independent investigation too expensive and dilatory to be made for the purposes of a temporary speculation. They appreciated the moral responsibility which is assumed by such a house in offering the loan to their friends and to the public. They had no reason to doubt the good faith of Bischoffsheim & Goldschmidt, because the Paris firm as a member of the syndicate had more than one-third of the whole interest in the venture; and the relations of the syndicate with Bischoffsheim & Goldschmidt, through the Paris firm and through the president of the bank, were so intimate and confidential that any departure from the duty of exercising the utmost good faith would have been rank treachery. No commentary upon the nature of these relations, and the light in which they were regarded at the time by all concerned, is needed in view of the agreement of February 19, 1874, by which they exacted an equivalent for the "special advantages" enjoyed by Bischoffsheim & Goldschmidt, and the latter acknowledged the justice of the claim. So implicit was their confidence in the judgment and good faith of Bischoffsheim & Goldschmidt that they did not care to examine the documents and papers relating to the railway company which they knew were in the hands of Mr. Sharp. It is quite impossible to believe that the syndicate was not put in possession of all the information necessary to induce its members to participate in the subscription, or that "all the conditions of the business" were not given to the syndicate as required by Mr. May. This information may not have been given to all the members; but that it was given to the Paris firm, to the president of the bank, and to the controlling spirits of the syndicate before the subscription was made, can hardly be doubted. It was the reliance upon such information and upon the judgment and good faith of Bischoffsheim & Goldschmidt, and not upon the statements of the prospectus, that led the members of the syndicate to subscribe. The conclusion that the complainants were not induced by the statements of the prospectus to buy the bonds is fatal to their case, so far as it proceeds upon misrepresentation, and dispenses with any investigation of the evidence with a view to ascertain whether the trustees, or the recipients of money from them, believed or had any reason to suppose that the prospectus contained fraudulent representations.

The question remains whether the prospectus contained a promise for a specific application of the proceeds of the bonds offered for sale which impressed an equity upon the proceeds in favor of the complainants, and entitled them upon a misapplication to call the defendants to an account. This question may be disposed of briefly. Those who read the prospectus could fairly gather from its several statements the understanding that the railway company proposed to use the proceeds of the bonds then offered to complete the construction of the railway, and for such other general purposes of the undertaking as might be necessary, but not for the extinction of underlying mortgages. The statements about the reservation of the remaining $6,000,000 of the issue for the extinction of the outstanding existing mortgages and stock of the constituent compa-

nies are inconsistent with the idea that any part of the proceeds of the other $6,250,000 were to be used for that purpose. But no theory of trust can be founded upon the effect of these statements. They are the mere representations of intention, the expression of the expectation and purpose of the railway company, which fall short of a promise, and do not partake of the definite and obligatory nature of a contract. Not only is there no distinct promise not to use the proceeds for the general purposes of the undertaking, but the statement is that they will be used for these purposes; and the intention of the company not to use them for one of these purposes, the extinction of the underlying liens, is left to inference only, and is implied from the statement that other bonds will be so used. No purchaser of bonds was justified in assuming that the company intended to tie itself rigidly to conditions which in the exigencies of the enterprise might become injudicious or impracticable, or in attributing such a meaning to the recitals as they would bear if contained in a contract. A prospectus is an introductory proposal for a contract in which the representations may or may not form the basis of the contract actually made. It may contain promises which are to be treated as a sort of floating obligation to take effect when appropriated by the persons to whom they are addressed, and amount to a contract when assented to by any person who invests his money upon the faith of them. But if the statements as to what is proposed to be done in the future are not distinctly promissory, are equivocal, and capable of different meanings, the inference is reasonable that they are not put forward or acted upon as essential stipulations. Whether the statements are to be regarded merely as the expressions of intention, or as a contract with the purchasers of the bonds that the proceeds should be devoted to the exclusive purpose of paying for the construction of uncompleted parts of the railway, the failure to make such an application of them cannot be redressed in the present action. In the view the most favorable for the complainants they loaned their money to the railway company upon the security of the mortgage accompanying the bonds, and upon the faith of a promise by the company to use the money in a particular way for their advantage. By this transaction the railway company and the complainants did not enter into any fiduciary relation, but simply became debtor and creditor. While the promoters of a company occupy a fiduciary relation towards those they induce to become shareholders, and the company itself is a trustee for its stockholders, bondholders stand upon a different footing. They are merely lenders upon security, and as creditors part with their title to the money loaned. *Van Weel* v. *Winston*, 115 U. S. 228; 6 Sup. Ct. Rep. 22. If a borrower refuses to keep his agreement with the lender to use the money borrowed in a particular way, the lender has his remedy at law for breach of contract, or in an appropriate case may have relief in equity and compel specific performance. But there is no principle of equity which allows him to pursue the money as a trust fund when the borrower has parted with it to another who has obtained title to it as between himself and the borrower. Even where money has been obtained by deceit, so that in judgment of

law the contract of loan is voidable as between the lender and the borrower, it cannot be followed by the lender into the hands of one who has received it innocently and with a right to retain it as against the borrower. The law, from considerations of convenience and public policy, in order to give security and certainty to business transactions, adjudges that the possession of money vests the title in the holder as to all persons who receive it from him innocently upon a valid consideration, whether upon a new consideration or for an existing debt. *Miller* v. *Race*, 1 Burrows, 452; *Justh* v. *Bank*, 56 N. Y. 478; *Stephens* v. *Board, etc.*, 79 N. Y. 183. In *Mason* v. *Waite*, 17 Mass. 560, a carrier to whom a sum of money had been intrusted lost it to the defendant gaming, and the court held it could be recovered by the owner because the defendant received it unlawfully, but declared that had the carrier paid the money to an innocent person to satisfy a debt of his own, "the case might have been different, as it would be mischievous to require persons who receive money in the way of business or in payment of debts to look into the authority of him from whom they receive it." Although that was an action at law, it was one for money had and received, which is of the nature of an equitable action. It is only when money is held in a fiduciary character, so that the equitable title is in the beneficial owner, that the latter can follow it into the hands of a third person. In the present case the moment the bonds were sold the equitable title to the money vested in the trustees by force of the consolidation agreement as modified by the disbursement trust agreement, and as soon as it was received they acquired the legal title and the equitable title vested in the beneficiaries designated by the latter instrument. The trustees were not the borrowers. They were agents for the beneficiaries of the disbursement trust agreement, whose duty it was to see that the proceeds realized from the bonds were devoted to the specific uses of that trust; and they had no other duty or power in the premises. Those who issued the prospectus and negotiated the bonds were not their agents, but were the agents of the railway company, and the trustees could not be responsible officially for their acts. If they had sanctioned the representations of the prospectus, and had accepted the proceeds of the loan upon the express or implied undertaking to appropriate them exclusively to pay for the construction of uncompleted railway, they might have rendered themselves personally accountable to those for whom they undertook to act. They could not have consented to such an appropriation without disloyalty to the trusts of the disbursement trust agreement, and would have been responsible to the beneficiaries under that agreement for any disposition of the money not authorized by the instrument. But if they had accepted the complainant's money upon a foreign trust they could not be heard to deny their own responsibility for refusing to comply with the trust. The case of *Wilson* v. *Church*, 13 Ch. Div. 1, cited for the complainants, is not inconsistent with these views. In that case money was loaned upon bonds to a company which had issued a prospectus containing a statement that certain persons named would act as trustees for the bondholders and exercise their powers for the protection

of the bondholders, and would retain out of the proceeds of the bonds sufficient to pay for building a railway which was to be built for the company by another company, and apply the proceeds as received to pay for the work done upon the railway. The proceeds were delivered by the company to these persons who accepted them as trustees to make the promised application for the bondholders. The railway was not built, and the enterprise contemplated by the company became impracticable, and thereupon the bondholders brought suit to recover the money in the hands of the trustees. The company made no claim to the money. The case was treated as one where, in the language of BRETT, L. J., "the fund contributed by the bondholders was deposited for the trust under which it was to be handed over from time to time in payment for work done, and otherwise it was not to be handed over." Upon the plainest principles of equity the fund was adjudged to be returned to the bondholders. They had never parted with their equitable title to the moneys which were, by contract, to be held and appropriated for their protection by their own trustees.

Not only was there no fiduciary relation in the present case which authorized the complainants to regard the trustees under the disbursement trust agreement as their trustees, bailees, or agents, but the complainants were not justified in relying upon any promise contained in the prospectus as a contract by the officers of the railway company to appropriate the money in a way not authorized by the disbursement trust agreement. They were bound to take notice of the limitations upon the power of the company to make any disposition of the proceeds of the bonds inconsistent with the provisions of the consolidation agreement which was the charter of the company. Whenever a corporation goes for business it carries its charter, and all persons dealing with it must take notice of the powers and limitations thereby imposed upon its agents. *Railway Co.* v. *Gebhard,* 109 U. S. 537, 3 Sup. Ct. Rep. 363; *Ernest* v. *Nicholls,* 6 H. L. Cas. 418. An inspection of that instrument would not have informed them of the existence of the disbursement trust agreement, but it would have informed them that the proceeds of the bonds were required to be appropriated to specific objects, and that this was a fundamental feature of the consolidated scheme. That instrument was sufficient to put them upon inquiry, and knowledge must be imputed to them of all the facts which a sufficient inquiry would have disclosed. The prospectus itself pointed out a proper source of inquiry to all who wished to become acquainted with the documents creating the company and creating the trust which the trustees were to administer, and inquiry at that source would have led them to the disbursement trust agreement, and informed them that the promise of the company, contained in the prospectus, was one which it was beyond the power of the company to make or fulfill. Consequently if the complainants loaned their money to the railway company relying upon that promise, they did so at their own peril. Certainly they cannot follow it into the hands of those who never consented to receive it upon such terms, but received it because they were entitled to it as trustees of a different trust.

There are interesting questions of law in the case which have not been considered. It has been insisted for the defendants that upon any view of the facts which might have been reached the bill ought to be dismissed because the controversy is not one of equitable cognizance, and because the complainants have separate interests and cannot join in the suit. If the suit were brought against those defendants only who were the immediate recipients of the money of the complainants, a court of law would be the appropriate and exclusive forum for the controversy, so far as it proceeds upon the theory of fraud or deceit; because no relief peculiar to a court of equity, such as the cancellation of documents or the award of damages unknown to courts of law, would be essential to the adequate protection of the complainants, and the only decree which would be directed would be one for the recovery of the money with interest. *Buzard* v. *Houston,* 119 U. S. 347, 7 Sup. Ct. Rep. 249; *Ambler* v. *Choteau,* 107 U. S. 586, 1 Sup. Ct. Rep. 556. But an action at law would not lie against those defendants and the defendants who it is alleged became subsequent recipients of the money with notice of the fraud. It would seem, therefore, that the complainants have the right to come into a court of equity in order to obtain a rescission of their purchase and a recovery of the proceeds from those who committed the fraud and at the same time from those who have received part of the proceeds under circumstances which render them trustees *ex maleficio,* and thus obtain a remedy more adequate and complete than they could obtain at law. But it is unnecessary to decide this question or the question whether the complainants can sue jointly, or to consider other objections which have been urged against the complainant's case. The parties who have litigated this cause so many years and at such great expense seem fairly entitled to an exposition of the real merits of the controversy as they appear to the court, and the case should not be unnecessarily disposed of upon any technical grounds. The complainants have lost their money by buying the bonds of a company officered and commended to public confidence by many of the best-known capitalists of this country. They undoubtedly supposed when they saw the names of such men connected with the enterprise as promoters or officers of the company that the enterprise had at least a reasonable chance of success; but it collapsed within a few months of the time when it was advertised in such glowing terms. They may not have been aware when they brought this suit, and may not be aware now, that the enterprise never had any chance to live after the refusal of Bischoffsheim & Goldschmidt to advance the money which the promoters supposed they would advance pending the negotiation of the whole issue of first mortgage bonds, and that primarily Bischoffsheim & Goldschmidt should be considered as responsible for its failure. If the officers of the company had received the money which they expected, the uncompleted railways could have been built, and the consolidated railway equipped, opened for traffic, and put upon the basis of a going concern. Whether the expectations of the promoters would have been realized is a matter of conjecture only, but it is not unreason-

able to suppose that the new railway would have gradually gathered strength and eventually obtained a fair traffic and become a paying property. The bill is dismissed.